**STATE OF HAWAII**, Plaintiff–Appellee, v. **JOHN ANTHONY KELEKOLIO**, Defendant–Appellant

NO. 15798

(CR. NO. 91–0148)

APRIL 15, 1993

LUM, C.J.,* MOON, KLEIN, AND LEVINSON, JJ., AND INTERMEDIATE COURT OF APPEALS JUDGE WATANABE, ASSIGNED BY REASON OF VACANCY

---

*Chief Justice Herman Lum, who heard oral argument in this case, retired on March 31, 1993. *See* HRS § 602–10 (1985).

480

OPINION OF THE COURT BY LEVINSON, J.

The defendant–appellant John Anthony Kelekolio (Kelekolio) appeals his November 15, 1991 convictions of sexual assault in the second degree and kidnapping. Kelekolio raises a number of substantial points of error on

appeal,[1] but only one is outcome dispositive. Because the trial court committed plain error in failing to conduct a competency hearing regarding the complaining witness, and because we are not convinced beyond a reasonable doubt that the error was harmless, we vacate Kelekolio's judgment of conviction and remand for a new trial.

## I. BACKGROUND

On January 6, 1991, Kelekolio, a "Handi–van" driver, allegedly kidnapped his lone passenger (hereinafter referred to as ("the complainant")), drove the van he was operating into a parking lot, and sexually assaulted her. The complainant, who suffers from Down's Syndrome, is a mentally retarded woman and functions at the cognitive level of a four– to seven–year–old child. At the time, Kelekolio was transporting the complainant to her place of employment, Helemano Plantation, where she was receiving vocational training in food service.

On January 16, 1991, Kelekolio was charged in a three–count indictment with (1) sexual assault in the second degree (Count I) in violation of Hawaii Revised Statutes (HRS) § 707–731(1)(b) (Supp. 1992),[2] (2) sexual

---

[1] The result we reach in this appeal renders it unnecessary to address Kelekolio's claim that he was denied the effective assistance of counsel at trial. In connection with section II. B. of this opinion, however, we note that trial counsel's failure to make an offer of proof in order to lay the necessary foundation for the testimony of witnesses can amount to ineffective assistance. *See State v. Aplaca*, 74 Haw. 54, 71–72, 837 P.2d 1298, 1307 (1992).

[2] HRS § 707–731 provides in relevant part:
 **Sexual assault in the second degree.** (1) A person commits the offense of sexual assault in the second degree if:
 . . . .

assault in the third degree (Count II) in violation of HRS § 707–732(1)(c) (Supp. 1992),[3] and kidnapping (Count III) in violation of HRS § 707–720(1)(d) (Supp. 1992).[4] Following a jury trial, Kelekolio was convicted of Counts I and III and was sentenced to two concurrent ten–year terms of imprisonment.

## A. Kelekolio's Confession
## 1. Voluntariness of Kelekolio's statement to Detective Kim

The Honolulu Police Department (HPD) arrested Kelekolio on January 7, 1991, at 1:30 p.m. Because

---

 (b) The person knowingly subjects to sexual penetration another person who is mentally defective, mentally incapacitated, or physically helpless . . . .

The indictment alleged, *inter alia*, that Kelekolio inserted his penis into the complainant's vagina.

[3] HRS § 707–732 provides in relevant part:

**Sexual assault in the third degree.** (1) A person commits the offense of sexual assault in the third degree if:

 . . . .

 (c) The person knowingly subjects to sexual contact another person who is mentally defective, mentally incapacitated, or physically helpless . . . .

The indictment alleged, *inter alia*, that Kelekolio put his hand on the complainant's vagina.

[4] HRS § 707–720 provides in relevant part:

**Kidnapping.** (1) A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to:

 . . . .

 (d) Inflict bodily injury upon that person or subject that person to a sexual offense . . . .

The indictment alleged, *inter alia*, that Kelekolio restrained the complainant with intent to inflict bodily injury upon her or to subject her to a sexual offense.

Kelekolio was transferred from the Pearl City station to the Honolulu station after dinner hours, he did not receive a meal that evening. Commencing at 8:45 a.m. on January 8, 1991, HPD Detective Dennis Kim (Detective Kim) conducted a forty–five minute interview of Kelekolio. At no time during the interview did Kelekolio claim that he was tired or hungry. Nevertheless, he testified at trial[5] that he had had no sleep during the night before his arrest because he had been caring for his sick children; he further testified that he could not sleep on the night of his arrest because he was worried about his family. Kelekolio also testified at trial that, although he was offered breakfast on the morning of January 8, 1991, he refused to eat because he considered the food served by HPD to be "slop."

Before Detective Kim began the audiotaped interview, Kelekolio read and signed a standard "HPD Form 81," which advises interviewees of their *Miranda* rights. At the outset, Detective Kim made it clear that Kelekolio was to receive nothing in exchange for agreeing to be interviewed. Detective Kim emphasized that Kelekolio had a right to the presence of an attorney during the interview and that he could refuse to answer questions at any time. By marking the appropriate spaces on the form, Kelekolio indicated that he understood the nature of his

---

[5] Kelekolio urges in his reply brief that his trial testimony may not be considered for purposes of establishing whether the circuit court erred in ruling, as a pretrial matter, that his statement to Kim had been voluntary. Reply brief at 2 n.3. Kelekolio is mistaken. In *State v. Villeza*, 72 Haw. 327, 817 P.2d 1054 (1991), we ruled that appellate review of whether a defendant's statement was coerced required us "to examine *the entire record* and make an independent determination of the ultimate issue of voluntariness." *Id.* at 331, 817 P.2d at 1056 (emphasis added and citations omitted). Accordingly, we must consider Kelekolio's testimony both at the voluntariness hearing and at trial.

constitutional rights, he did not want an attorney present during the interview, and he wanted to tell Detective Kim "what happened." At trial, Detective Kim testified that he reviewed the HPD Form 81 three times with Kelekolio — twice before the taped interview began and a third time at the commencement of the taped interview. A full review of the audiotape reveals that Detective Kim never raised his voice or vocalized aggressively.

While testifying at the voluntariness hearing and at trial, Detective Kim acknowledged that he made two false statements during Kelekolio's interview, namely that: (1) the police possessed physical evidence of sexual activity that incriminated Kelekolio; and (2) bruises on the complainant's arms and legs indicated that force had been used. Detective Kim further testified that the false statements were deliberate lies, prompted by his dissatisfaction with Kelekolio's inconsistent versions of the incident and designed to elicit a truthful statement from Kelekolio. Detective Kim explained that, at a seminar on interrogation techniques, he had been instructed to mislead suspects during interviews in order to extract truthful confessions.

In Kelekolio's fourth and final version of the incident, he admitted to Detective Kim that: (1) he had stopped the Handi–van at the parking lot; (2) the complainant had taken off her clothes; (3) he had inserted his penis into the complainant's vagina; and (4) immediately thereafter, he had withdrawn and ejaculated into the complainant's hand. Following these disclosures, Kelekolio vehemently denied any use of force despite the fact that Detective Kim had maintained that there were bruises on the complainant's body.

During the interview, Kelekolio claimed that the complainant had referred to sexual activities that she had

purportedly engaged in with her "boyfriend Tony." Detective Kim disputed both that the complainant had a boyfriend and that Tony existed at all. In these respects, Detective Kim was engaging in bald assertion, inasmuch as he had no knowledge as to whether the complainant had a boyfriend or whether there was a "Tony."

On September 17, 1991, pursuant to a motion *in limine* filed by the prosecution,[6] the trial court conducted a hearing to determine whether Kelekolio had made his statement to Detective Kim voluntarily. Following the hearing, the trial court ruled in the affirmative.

At trial, Kelekolio testified that his admissions to Detective Kim during the interview, proffered in his fourth version of the incident, were lies; rather, he testified that he had admitted to having intercourse with the complainant only to satisfy Detective Kim so that he would be allowed to go home and see his family.

## 2. **Jury instructions**

Following the evidence adduced at trial and the final arguments of the attorneys, the trial court instructed the jury as to the law of the case, giving the following jury instructions by agreement of the parties.

Court's Instruction No. 1 provided in relevant part:

> You are the exclusive judges of the facts of this case. However, you must follow these instructions even though you may have opinions to the contrary.
>
> You must consider all of the instructions as a whole and consider each instruction in the light of

---

[6] The prosecution's motion *in limine* was not actually filed until September 18, 1991.

all of the others. Do not single out any word, phrase, sentence or instruction and ignore the others. Do not give greater emphasis to any word, phrase, sentence or instruction simply because it is repeated in these instructions.

Court's Instruction No. 8 provided:

While you must consider all of the evidence in determining the facts in this case, this does not mean that you are bound to give every bit of evidence the same weight. You are the sole and exclusive judges of the effect and value of the evidence and of the credibility of the witnesses.

It is your exclusive right to determine whether and to what extent a witness is worthy of belief and credit and to give weight to the witness's testimony accordingly.

Court's Instruction No. 9 provided in relevant part:

You, as jurors, are the sole judges of the credibility of all witnesses and the weight their testimony deserves.

It is your exclusive right to determine whether and to what extent a witness should be believed and to give weight to his or her testimony accordingly. In evaluating a witness, you should consider . . . the witness's apparent candor or frankness, or lack thereof; . . . the extent to which, if at all, the witness is either supported or contradicted by other evidence; the extent to which, if at all, the witness has made contradictory statements, whether in trial or at other times; and all other circumstances surrounding the witness and bearing upon his or her credibility.

Court's Instruction No. 10 provided:

If you find and believe from the evidence that any witness in this case has knowingly and willfully sworn falsely to any material fact in this trial or that any witness has knowingly or willfully exaggerated or suppressed any material fact or circumstance in this trial for the purpose of deceiving, misleading or imposing upon you, then you have a right to reject the testimony of such witness except insofar as the same is corroborated by other credible evidence or believed by you to be true.

State's Supplemental Instruction No. 11, which the trial court read to the jury, provided that "[t]he use of deception, in and of itself, need not render a subsequent statement *unreliable* or *untrustworthy*[,] [a]lthough deception, if any, should be considered in assessing reliability and trustworthiness." (Emphasis in original.)

In addition, the trial court, *inter alia*, gave State's Supplemental Instruction No. 12 over Kelekolio's objection. State's Supplemental Instruction No. 12 provided that "[t]here is nothing wrong with the use of trickery in obtaining a confession *as long as it is not likely to produce a false confession.*" (Emphasis added.)

## B. Evidence of Complainant's Fantasies

The prosecution's motion *in limine* also sought, pursuant to Hawaii Rules of Evidence (HRE) 412 (1992),[7] to

---

[7] HRE 412 (1985) provided in relevant part:

**Rape cases; relevance of victim's past behavior.** (a) Notwithstanding any other provisions of law, in a criminal case in which a person is accused of . . . sexual assault under any of the

preclude Kelekolio from introducing evidence relating to any of the complainant's past sexual history, including any references to "Tony." The motion was supported by an affidavit of the deputy prosecuting attorney (DPA) assigned to the case, which alleged, *inter alia*, that: (1) Kelekolio would seek to introduce evidence, through unnamed co–workers and supervisors of the complainant, that the complainant talked frequently about sex and was infatuated with Tony; (2) such evidence constituted hearsay;[8] and (3) the evidence was irrelevant inasmuch as consent was not an element of the sexual offenses charged.

Kelekolio's trial counsel, Victor Agmata (Agmata), did not oppose the motion *in limine*, and the trial court granted it. In the course of the hearing, however, the following colloquy took place:

> MR AGMATA: Well, then there . . . will be testimony about what [the complainant] fantasizes about and what she imagines, it goes to the truth-

---

provisions of chapter 707 . . . , reputation or opinion evidence of the past sexual behavior of an alleged victim of such . . . sexual assault is not admissible.

. . . .

(d) For purposes of this rule, the term "past sexual behavior" means sexual behavior other than the sexual behavior with respect to which . . . sexual assault is alleged.

In 1992, HRE 412 was amended and its title changed to "*Sexual assault cases; relevance of victim's past behavior.*" The amendment, *inter alia*, "makes clear that what is excluded is evidence of the victim's character offered to show a propensity or inclination to behave similarly [*i.e.*, to engage in similar sexual conduct] on the occasion in question. It is believed that this was the original intent of Rule 412, and that the omission of this language in the original draft was inadvertent." Supplemental commentary on HRE 412 (1992).

[8] HRE 801(3) (1985) defines "hearsay" to mean "a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted."

fulness and the veracity of what she talks about, her behavior.

They [*i.e.*, the proffered witnesses] all relate . . . to the extent of her mental capacity, because her mental capacity is an issue in this particular case. *We don't intend to prove whatever subjects she talks about as to the truthfulness of those statements*, it's just the extent of what she is mentally capable of talking about. And I think that is all relevant. And certainly it may be rebuttable [sic — probably rebuttal] evidence as to what she may be testifying to.

. . . .

THE COURT: . . . [W]e're away from the subject matter of this motion. *They do not involve sexual acts.*

MR. AGMATA: No, of course — *we don't even have evidence of sexual acts.*

THE COURT: Then there's no basis to deny that motion.

MR. AGMATA: That's right.

THE COURT: The motion is granted.

(Emphasis added.)

Accordingly, Agmata expressly reserved — and the trial court did not foreclose — the right to adduce otherwise admissible evidence that the complainant engaged in sexual fantasies as a function of her childlike mental state, not for the purpose of proving that she had *actually* engaged in past behavior in conformity therewith, but for the diametrically opposite purpose of proving that she had *not*. Implicit in Agmata's offer of proof was the suggestion that the complainant had fantasized her account of

Kelekolio's conduct consistent with her general propensity to do so.

When the audiotape of Detective Kim's interview of Kelekolio was received in evidence at trial, portions in which Kelekolio described the complainant's alleged accounts of her past sexual history had been inexplicably redacted. After the audiotape was played for the jury, Agmata announced that he was "extremely outraged." During the ensuing bench conference, Agmata accused the prosecution of intentionally deleting portions of the interview that were beneficial to Kelekolio's position.

The following day, the DPA elicited from Detective Kim a recitation of a number of Kelekolio's statements that had been redacted from the audiotape. These statements consisted of the following: (1) "[s]he kept telling me that she like sex"; (2) "[s]he kept asking me that she like sex"; (3) "[y]eah, she said something about 'em, you know, that she, she loves sex. She loves sex"; and (4) "[t]hen again, she asked me again if I was married. I said, oh, yes, yes, yes, I'm married. Me and my wife we're getting along. We're just, you know, we're still groggy on the way our relationship going but we're working 'em out, you know, and then back to 'em, what you call, I asked her, what, what she do at her working place and she told me that she's . . . ."

After Detective Kim's recitation, Agmata registered no further objection to the scope of the audiotape's subject matter to which the jury had been exposed, notwithstanding that there were other redacted portions in which Kelekolio recounted references by the complainant to a photograph that she had of Tony and to sexual interludes in which she claimed to have engaged with him, including one during which her parents (with whom she lived) had caught her in bed with Tony on the night of January 5,

1991. No effort was ever made to establish whether Tony and the complainant had or had not ever actually engaged in sexual conduct.

The trial court foreclosed Agmata on hearsay grounds from cross–examining the complainant regarding whether she had told Kelekolio in the Handi–van that she had been caught by her parents in bed with Tony. On the other hand, although he had an opportunity to do so, Agmata did not advise the court that his objective was to seek to prove that the complainant had a *habitual* propensity to relate her imagined sexual escapades to others as the truth and thus to discredit the complainant's account of Kelekolio's alleged offenses.[9]

---

[9] HRE 406 (1985), relating to "[h]abit" and "routine practice," provides in relevant part that "[e]vidence of the habit of a person . . . , whether corroborated or not . . . , is relevant to prove that the conduct of the person . . . on a particular occasion was in conformity with the habit . . . ."

Professor Bowman sheds the following light on the scope of HRE 406:

What is a habit? The rule 406 commentary refers to a "person's regular practice of meeting a particular kind of situation with a specific type of conduct." . . . Understanding the concept of habit is enhanced by comparison with rule 404, because there character and prior instances of conduct are inadmissible to establish action on a particular occasion "in conformity therewith." But when the previous practice of a person amounts to a "normal routine," . . . rule 406 allows receipt of the evidence to prove action in conformity with the habit.

[In] *State v. Okuda*, 71 Haw. 434, 795 P.2d 1 (1990), affirming convictions for six counts of fixing traffic tickets[,] [b]ecause court clerks and police officers were unable to recall the details of particular tickets Okuda was alleged to have unlawfully fixed, they were permitted to testify about their habits and routines in the issuance of tickets, the signing of affidavits, and the processing of tickets. The supreme court approved and added that "relevancy, in general, is the only limitation upon proof of habit or routine

Agmata pursued his "fantasy" theory through three additional witnesses: Anthony Lapenia (Lapenia), the

practice," 71 Haw. at 450, 795 P.2d at 10 (quoting from 10 J. MOORE & H. BENDIX, MOORE'S FEDERAL PRACTICE para. 406.02, at IV–139 (2d ed. 1988)). The court also observed that habit can be proved by opinion testimony or by evidence of specific instances of conduct.

Recent federal cases cite the advisory committee's note to Fed. R. Evid. 406 (quoted also in the 1980 commentary to Hawaii's rule 406) for the proposition that "adequacy of sampling and uniformity of response" are factors in determining whether a number of specific instances of conduct constitute a habit . . . .

To the extent that [federal case law] suggests that rule 406 is limited to reflexive, "non–volitional" behavior, it misreads the FRE legislative history. The advisory committee's note recognizes that "The doing of the habitual acts may become semi–automatic," and suggests that the volitional quality of the acts mustered in support of an asserted habit is a proper factor on the question whether a number of specific instances of conduct supports the inference of "invariable regularity" required for a determination of habit. The upshot is that, when the rule 406 proponent offers instances of conduct, the determinative issue is consistency and regularity, and the relevant factors are (1) the nature and quality of the behavior in issue, including its volitional character, (2) the adequacy of the proponent's sampling methodology, and (3) the sheer number of instances presented in support of the assertion of habit. . . . What then is the proper distinction between character and habit? Character is a generalized disposition . . . ; habit is a specific and invariable practice.

How shall a habit be proved? . . . A witness' opinion of someone else's habit, based on personal knowledge so as to conform with rule 602 and rule 701 requirements, will constitute "[e]vidence of the habit of a person" in satisfaction of rule 406. If, on the other hand, the witness recounts specific instances of conduct, a question of sufficiency may be presented. The advisory committee's note to Fed. R. Evid. 406 cites approvingly *Whittemore v. Lockheed Aircraft Corp.*, 65 Cal. App. 2d 737, 151 P.2d 670 (1944), a case in which evidence that a decedent had, on four prior occasions, piloted planes from defendant's factory to decedent's place of employment was admitted to prove that he probably piloted a plane that crashed, killing everyone on board. The sheer number of prior instances of particular conduct is an important factor in establish-

complainant's manager, supervisor, and instructor at Helemano Plantation; Darlene Waiwaiole (Waiwaiole), her assistant manager and instructor; and Debbie Yap (Yap), one of Kelekolio's fellow Handi–van drivers.

Lapenia testified that the complainant had a photograph of him, that he had observed her showing it to her fellow trainees, and that she had a tendency to fantasize about a variety of subjects, including "that thing." Regarding the latter subject, Lapenia elaborated that "as a teacher, I always tell her, stop fantasizing about that. She talks about getting married and this and that but I always tell her, it's not to be spoken here at the facility, because we're food service." Lapenia opined that "all special people have their fantasies." Significantly, Agmata never attempted to ask Lapenia whether he had ever heard the complainant verbalize fantasies of sexual involvement with him.

Waiwaiole testified that she had heard the complainant "say[] that she's pregnant and we know that she's not pregnant" and "[t]hat she has a baby." Other than claims that "her father harasses her," Waiwaiole was unaware of any additional falsehoods that the complainant had articulated.

Before Agmata had a chance to begin his examination of Yap, the DPA requested an offer of proof at the bench. Agmata represented that Yap would testify that she was an employee of the Handi–van Company, that she had transported the complainant in the past, and that she had "heard certain statements that [the complainant] has

---

ing a habit, but perhaps even more important is evidence from which an inference of consistency and invariability can be drawn.

A. Bowman, *Hawaii Rules of Evidence Manual* § 406–2, at 122–24 (1990), and at 8–10 (Supp. 1992) (citations omitted).

made . . . . That's all." Although the court sustained the DPA's hearsay objection to testimony of any of the complainant's statements made in Yap's hearing, Agmata failed to make any offer of proof relating to *habitual* fantasized sexual activity in order to demonstrate that the complainant had fantasized the incident in question.[10] The court subsequently barred Agmata from exploring the issue of fantasized statements, but Agmata never made an offer of proof as to why he was pursuing the matter.[11]

## C. **The Complainant's Competency to Testify**

During the prosecution's case in chief, James Lomont, Ph.D (Lomont), a clinical psychologist who had previously examined the complainant, was called to testify. Lomont opined that the complainant had an intelligence quotient (IQ) of 43 and operated at the cognitive level of a four– to seven–year–old person. On cross–examination, Lomont expressed opinions that the complainant was intellectually capable of fantasizing, changing facts to avoid punishment, and augmenting and omitting facts regarding an event she had experienced.

The prosecution later called the complainant as a witness. Having established her diminished level of cognitive functioning through Lomont, the DPA endeavored to lay a foundation for the complainant's competency to testify[12] via the following exchange:

---

[10] *See supra* note 9.

[11] *See supra* note 1.

[12] HRE 601 (1985), which sets forth the "[g]eneral rule of competency," provides that "[e]very person is competent to be a witness except as otherwise provided in these rules."

HRE 603.1 (1985) provides that "[a] person is disqualified to be a witness if the person is (1) incapable of expressing oneself so as to be

Q. [By the DPA:] [Complainant], is telling the truth good or bad?

A. [By the complainant:] Good.

Q. Is telling a lie good or bad? Is telling a lie good or bad?

A. *Good.*

Q. Okay. [Complainant], do you know you're testifying in court today. You know you're talking to everybody here today, right? You have to tell the truth, okay. You understand that?

A. (Witness *shakes* head.)

Q. You have to answer, yes or no. You cannot nod your head, because this man that's sitting right here has to take down everything that you say, okay. You know that you have to tell the truth today, [Complainant]?

A. Yes.

(Emphasis added.)

The DPA then began her direct examination of the complainant. The complainant was unable to identify Kelekolio, who was present in the courtroom. She told the DPA that she was "very scared." The complainant eventually testified that Kelekolio had forced her to the back of the Handi–van, penetrated her vagina with his penis, instructed her not to tell anyone, and drove her to work at the Helemano Plantation. On cross–examination, she was unable to explain the meaning of "kidnapping" and "rape" — words that she had utilized in her testimony.

---

understood, either directly or through interpretation by one who can understand the person, or (2) *incapable of understanding the duty of a witness to tell the truth.*" (Emphasis added.)

Agmata failed to object at any time to the complainant's competence to testify, and the trial court did not engage in an independent inquiry to establish competence.

## II. DISCUSSION
### A. Kelekolio's Confession
#### 1. Voluntariness

On appeal, Kelekolio contends that his audiotaped statement to Detective Kim was not freely and voluntarily given, but rather was "coerced." Instead of accepting his initial denial of any wrongdoing at face value, Kelekolio complains that Kim repeatedly exhorted him to tell the "whole story" and wheedled a confession out of him through trickery and lies — *i.e.*, Kim's misrepresentations regarding (1) evidence of sexual activity implicating Kelekolio, and (2) the presence of bruises on the complainant's arms and legs, implying the use of force. Kim's tactics, Kelekolio argues, amounted to "mental or psychological" coercion, thereby rendering his consequent statement involuntary and inadmissible. We disagree.

Under the fifth amendment to the United States Constitution and article 1, section 10 of the Hawaii Constitution, "[n]o person shall . . . be compelled in any criminal case to be a witness against" himself or herself. *State v. Pau'u*, 72 Haw. 505, 509, 824 P.2d 833, 835 (1992). When a confession or inculpatory statement[13] is obtained in violation of either of these provisions, the prosecution will not

---

[13] "While a 'confession' admits commission of a crime, an 'inculpatory statement' admits a fact, circumstance or involvement which tends to establish guilt or from which guilt may be inferred." BLACK'S LAW DICTIONARY 768 (6th ed. 1990). We perceive no meaningful distinction between a "confession" and an "inculpatory statement" for purposes of the right against self–incrimination.

be permitted to use it to secure a defendant's criminal conviction. *Id.* (citing *State v. Russo*, 67 Haw. 126, 681 P.2d 553 (1984)).

The constitutional right against self–incrimination prevents the prosecution's use of a defendant's extrajudicial admissions of guilt where such admissions are the product of coercion. *State v. Wakinekona*, 53 Haw. 574, 576, 499 P.2d 678, 680 (1972) (footnote and citations omitted). The basic considerations that require exclusion of confessions obtained through coercion "are the inherent untrustworthiness of involuntary confessions, a desire that criminal proceedings be accusatorial rather than inquisitorial and a desire that the police not become law breakers in the process of achieving society's valid law enforcement objectives." *Id.* The burden is on the prosecution to show that the statement was voluntarily given and not the product of coercion. *Pau'u*, 72 Haw. at 509, 824 P.2d at 835 (citations omitted). The burden "is particularly heavy in cases where [the defendant] is under arrest." *Id.* (citations omitted).[14]

Appellate review of whether a defendant's custodial statement to the police is the product of coercion requires us to "examine the entire record and make an independent determination of the ultimate issue of voluntariness" based upon that review and "the totality of circumstances surrounding [the defendant's] statement." *State v. Villeza*, 72 Haw. 327, 330–31, 817 P.2d 1054, 1056 (1991) (citations omitted); *see Frazier v. Cupp*, 394 U.S. 731, 739, 89 S. Ct. 1420, 1425, 22 L. Ed. 2d 684 (1969).

---

[14] Additional considerations apply to police interrogation of post–indictment arrestees. *See State v. Liulama*, 9 Haw. App. 447, 454, 458–59, 462–63, 845 P.2d 1194, 1199, 1201–02, 1203–04 (1992).

## a. **Kelekolio's mental and physical condition**

A defendant's mental and physical condition can be part of the "totality of circumstances" relevant to the issue of the voluntariness of his or her custodial statements. *See, e.g.*, *State v. Smith*, 59 Haw. 565, 567–71, 583 P.2d 347, 349–51 (1978) (medical testimony as to general psychological effects of LSD held relevant to determining whether defendant's ingestion of LSD prior to confessing impaired his mental processes or rendered him incapable of understanding purpose and consequences of confession); *Commonwealth v. Peterson*, No. 1428–92–4, 52 Cr. L. 1317 (Va. Ct. App. Dec. 21, 1992) (defendant's statements, obtained while being transported to hospital to be treated for injuries sustained during arrest, held involuntary and inadmissible where defendant in pain, unable due to injuries to understand what was going on around him, experiencing blurred vision, had injested cocaine, having problems breathing and chest pains, and connected to heart monitor in ambulance). However, "in the absence of insanity or mental depletion, neither the voluntary character nor the admissibility of a confession is affected by the mental instability of the person making it." *State v. Kreps*, 4 Haw. App. 72, 77, 661 P.2d 711, 715 (1983) (citations omitted). Rather, the person's mental state is relevant only to the weight and effect to be given to the confession by the trier of fact. *Id.* at 78, 661 P.2d at 715 (citations omitted).

A confession may be rendered involuntary by "impermissible police conduct." *State v. Amaya–Ruiz*, 166 Ariz. 152, 164, 800 P.2d 1260, 1272 (1990), *cert. denied*, 111 S. Ct. 2044, 114 L. Ed. 2d 129 (1991); *cf. Miranda v. Arizona*, 384 U.S. 436, 460, 86 S. Ct. 1602, 1620, 16 L. Ed. 2d 694 (1966) ("[T]he government seeking to punish an

individual [must] produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth.") (quoted with approval in *State v. Wyatt*, 67 Haw. 293, 298, 687 P.2d 544, 549 (1984), and *State v. Russo*, 67 Haw. at 131–32, 681 P.2d at 558). However, the record is uncontroverted that Kelekolio's alleged lack of sleep and food were not the product of any impermissible scheme on the part of the police to lower his resistance or render him susceptible to improper suggestion; by his own admission, they were self–imposed. Indeed, Kelekolio "could have slept" and he was, in fact, offered breakfast prior to the commencement of his interview with Detective Kim. *Cf. Amaya–Ruiz*, 166 Ariz. at 165, 800 P.2d at 1273. Moreover, at no point during his interview did Kelekolio complain to Kim that he was tired or hungry. In fact, the audiotape reveals that Kelekolio was lucid throughout the interview, as demonstrated by his tone of voice, his ability to construct multiple versions of the incident, and his vehement denial of the use of force.

It is apparent from the "totality of circumstances" as reflected in the record that Kelekolio's mental and physical condition at the time of his interview with Detective Kim did not render his statement involuntary.

### b. **Exhortations to "tell the truth"**

Kelekolio complains that, instead of accepting his initial denial of sexual contact of any kind with the complainant, Detective Kim repeatedly challenged the completeness of his account and enjoined him to tell "the whole story" until he finally admitted to sexual penetration. In effect, Kelekolio seeks to fault Kim for urging him to tell the truth, although he does not suggest that Kim's

exhortations were accompanied by any sort of threat or promise.

Kelekolio's argument is unavailing, however, because "[m]ere advice from the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or promise does not render a subsequent confession involuntary." *Amaya–Ruiz*, 166 Ariz. at 165, 800 P.2d at 1273; *see also State v. Waugh*, 238 Kan. 537, 712 P.2d 1243 (1986). This is precisely because such "exhortations to tell the truth," *see Amaya–Ruiz*, 166 Ariz. at 165, 800 P.2d at 1273, are calculated to enhance, rather than diminish, the trustworthiness of an accused's inculpatory statement or confession. *Cf. Wakinekona*, 53 Haw. at 576, 499 P.2d at 680. Accordingly, the proposition that a police interrogator's unwillingness to accept a suspect's initial version of events at face value amounts to "coercion" *per se* is not only naive and disingenuous, but falls of its own weight; were we to accept it, the legitimate right of law enforcement agencies to seek voluntary confessions would be rendered nugatory.

### c. Detective Kim's use of deception

We next consider Kelekolio's claim that Detective Kim's use of deliberate misrepresentations regarding the existence of incriminating evidence of sexual activity and bruises on the complainant's arms and legs constituted "coercion" that was "mental and psychological in nature," opening brief at 26–27, thereby rendering his confession involuntary.

At the outset, we note that

> [i]t is by now well established that "certain interrogation techniques, either in isolation, or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of

justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment."[15]

... To assure that the fruits of such techniques are never used to secure a conviction, due process also requires "that a jury [not] hear a confession unless and until the trial judge [or some other independent decisionmaker] has determined that it was freely and voluntarily given."

*Crane v. Kentucky*, 476 U.S. 683, 687–88, 106 S. Ct. 2142, 2145, 90 L. Ed. 2d 636 (1986) (citations omitted and brackets in original). We therefore address the question whether, considering the totality of the circumstances surrounding Kelekolio's interview, Detective Kim's deliberate misrepresentations were of a character likely to produce an untrustworthy confession or of such a nature as to transform the investigative process into an "inquisition." *See Wakinekona*, 53 Haw. at 576, 499 P.2d at 680. For the reasons set forth below, we answer the question in the negative.

The current view of the United States Supreme Court on the subject appears to be reflected in *Frazier v. Cupp*, *supra*. In *Frazier*, the police, in the course of questioning the petitioner (Frazier), misrepresented to him that his co–defendant (Rawls) had already confessed to the offense with which they were charged and thereafter obtained a confession from Frazier. 394 U.S. at 737–38, 89 S. Ct. at 1424. The entire interrogation lasted slightly more than

---

[15] In *Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964), the United States Supreme Court held that the fifth amendment's protection against self–incrimination was made applicable to the states through the due process clause of the fourteenth amendment to the United States Constitution.

an hour. Frazier had been "given a somewhat abbreviated description of his constitutional rights." *Id.* at 737, 89 S. Ct. at 1424.[16] On habeas corpus review of Frazier's murder conviction, the Court, through Justice Marshall, ruled as follows:

> [Frazier] . . . presses the . . . argument that his confession was involuntary and that it should have been excluded for that reason. The trial judge, after an evidentiary hearing during which the tape recording [of Frazier's confession] was played, could not agree with this contention, and our reading of the record does not lead us to a contrary conclusion. Before [Frazier] made any incriminating statements, he received partial warnings of his constitutional rights; this is, of course, a circumstance quite relevant to a finding of voluntariness. . . . The questioning was of short duration, and [Frazier] was a mature individual of normal intelligence. *The fact that the police misrepresented the statements that Rawls had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible.* These cases must be decided by viewing the "totality of the circumstances," . . . and on the facts of this case we can find no error in the admission of [Frazier's] confession.

*Id.* at 739, 89 S. Ct. at 1425 (citations omitted and emphasis added). *Accord Amaya–Ruiz*, 166 Ariz. at 165, 800 P.2d at 1273 (where, in obtaining confession, police had

---

[16] Frazier's trial occurred after *Escobedo v. Illinois*, 378 U.S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977 (1964), but before *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). 394 U.S. at 738, 89 S. Ct. at 1424.

misrepresented to defendant that there were witnesses to offense, court held, *inter alia*, that "[s]tanding alone, such a lie during interrogation does not render a confession involuntary. . . . [O]ur inquiry is whether the totality of the circumstances indicates that a defendant's will was overborne. The circumstances indicate that the detective's lie did not result in an involuntary confession.") (citation omitted).

The general rule regarding the interrelation between police deception and the voluntariness of a resulting confession is comprehensively articulated in Annotation, *Admissibility of Confession as Affected by Its Inducement through Artifice, Deception, Trickery, or Fraud,* 99 A.L.R.2d 772 (1965 and Supp. 1992), as follows:

> The relatively few cases in which [the] question was raised have unanimously held that *confessions induced by subterfuges are not invalid and therefore inadmissible in evidence on the ground that they were obtained by means violating the principles of due process,* since the means employed did not under the facts of the case amount to mental coercion. Most of the cases discussing the effect of subterfuge on the admissibility in evidence of the confession . . . base the decision on the determination of the trustworthiness of the confession obtained. In this respect all the cases support the general principle that *confessions obtained through the use of subterfuges are not vitiated merely because of the employment of such methods as long as the methods used are not of a type reasonably likely to procure an untrue statement.* Since the use of subterfuge in and by itself does not render a confession inadmissible as

untrustworthy, . . . *cases . . . in which confessions [are] held inadmissible [involve] . . . a certain amount of collateral inducement which* in the opinion of the court *[is] sufficient to possibly influence the accused to make a confession regardless of his guilt.*

. . . .

A perusal of all the cases in this annotation reveals that in the great majority the claim that the confession was inadmissible because of a subterfuge was based on the ground that under the circumstances the subterfuge used made the confession untrustworthy. In most instances this claim was rejected in view of the well–settled principle that *the use of subterfuge alone has no tendency to produce an untrue confession.* This being the only test applied, *the subterfuge employed, in order to render the confession inadmissible, must* therefore *involve . . . a collateral inducement . . . which has a tendency to stimulate a confession irrespective of guilt even if the false representations had been true. . . .* As a matter of fact, *in all cases* in which a confession [has been] held inadmissible because not measuring up to the test of truthfulness, *there [has been] created in the mind of the accused the hope of some benefit . . . available to him only if he confessed.*

99 A.L.R.2d at 777–78 (emphasis added and footnotes omitted).

Consistent with the foregoing annotation, *compare* ***People v. Thompson***, 50 Cal. 3d 134, 266 Cal. Rptr. 309, 785 P.2d 857 (interrogating officers falsely represented to defendant that (1) his car had been connected with scene

of victim's death by tire tracks and soil samples, (2) physical evidence linked to victim found in his car, and (3) rope fibers found in his bedroom; confession held voluntary and admissible), *cert. denied*, 498 U.S. 881, 111 S. Ct. 226, 112 L. Ed. 2d 180 (1990), *and **People v. Watkins***, 6 Cal. App. 3d 119, 85 Cal. Rptr. 621 (1970) (defendant falsely told that his fingerprints found on getaway car; confession held voluntary and admissible on ground that deception not of type reasonably likely to procure an untrue statement) *with **State v. Nelson***, 69 Haw. 461, 470–71, 748 P.2d 365, 371 (1987) (confession extracted from defendant through "prayer[] and exorcism" and reference by police to biblical suggestion that "confession can save one from the wrath of God" made it "difficult to determine where . . . the police officer ended and the . . . savior be[gan]"; confession held involuntary and inadmissible) *and **People v. Hogan***, 31 Cal. 3d 815, 183 Cal. Rptr. 817, 647 P.2d 93 (1982) (confession held involuntary and inadmissible, not on account of false statements by police purporting to establish guilt, but because of promise of mental health treatment if defendant confessed).

The rationale underlying judicial acceptance of the very sort of police deception employed in the present case is set forth in 3 RINGEL, SEARCHES AND SEIZURES, ARRESTS AND CONFESSIONS § 25.2(d)(2), at 25–21 (1991 and Supp. 1992), in the following manner:

> Most commonly, the police tell a suspect they have found some highly incriminating evidence which renders futile any attempt by the suspect to dissemble further. Courts have uniformly accepted this technique, apparently on the view that an innocent person would not be induced to confess by such police deception. Therefore, when

police have falsely told suspects that their fingerprints have been found at the crime scene, that they have been implicated by the victim of the crime, or that other crucial evidence has been recovered, the resulting confessions have been ruled voluntary.

(Footnotes omitted.)

In our view, the relevant case law and scholarly authority, including that cited above, is amenable to the formulation of a rule by which to measure the legitimacy of the use of "deception" by the police in eliciting confessions or inculpatory statements from suspects and arrestees. That rule, which we now adopt, is that employment by the police of deliberate falsehoods *intrinsic* to the facts of the alleged offense in question will be treated as one of the totality of circumstances surrounding the confession or statement to be considered in assessing its voluntariness; on the other hand, deliberate falsehoods *extrinsic* to the facts of the alleged offense, which are of a type reasonably likely to procure an untrue statement or to influence an accused to make a confession regardless of guilt, will be regarded as coercive *per se*, thus obviating the need for a "totality of circumstances" analysis of voluntariness.

Although the foregoing rule will, of course, have to be applied on a case–by–case basis, some examples of *intrinsic* falsehoods would include such misrepresentations regarding the existence of incriminating evidence as (1) placement of the defendant's vehicle at the crime scene, *see Thompson*, (2) physical evidence linked to the victim found in the defendant's car, *see id.*, (3) discovery of the murder weapon, *see **Moore v. Hopper***, 389 F. Supp. 931 (M.D. Ga. 1974), (4) a claim that the murder victim is still

alive, *see **State v. Cooper***, 217 N.W.2d 589 (Iowa 1974), (5) presence of the defendant's fingerprints on the getaway car or at the crime scene, *see **State v. Cobb***, 115 Ariz. 484, 566 P.2d 285 (1977), *Watkins*, and ***People v. Kashney***, 111 Ill. 2d 454, 490 N.E.2d 688 (1986), (6) positive identification of the defendant by reliable witnesses, *see **Amaya–Ruiz***, 166 Ariz. at 165, 800 P.2d at 1273, and ***Commonwealth v. Meehan***, 377 Mass. 552, 562–69, 387 N.E.2d 527, 533–36, *cert. granted*, 444 U.S. 824, 100 S. Ct. 44, 62 L. Ed. 2d 30 (1979), *and cert. dismissed*, 445 U.S. 39, 100 S. Ct. 1092, 63 L. Ed. 2d 185 (1980), and (7) discovery of a nonexistent witness, *see **United States ex rel. Galloway v. Fogg***, 403 F. Supp. 248 (S.D.N.Y. 1975). Some examples of *extrinsic* falsehoods — of a type reasonably likely to procure an untrue statement or to influence an accused to make a confession regardless of guilt — would include (1) assurances of divine salvation upon confession, *see Nelson*, (2) promises of mental health treatment in exchange for a confession, *see Hogan*, (3) assurances of treatment in a "nice hospital" (in which the defendant could have his personal belongings and be visited by his girlfriend) in lieu of incarceration, in exchange for a confession, *see **People v. Sunset Bay***, 76 A.D.2d 592, 430 N.Y.S.2d 601 (1980), *appeal dismissed*, 54 N.Y.2d 808, 443 N.Y.S.2d 649, 427 N.E.2d 946 (1981), (4) promises of more favorable treatment in the event of a confession, *see Meehan*, (5) misrepresentations of legal principles, such as (a) suggesting that the defendant would have the burden of convincing a judge and jury at trial that he was "perfectly innocent" and had nothing to do with the offense, *see **Young v. State***, 670 P.2d 591 (Okla. 1983), (b) misrepresenting the consequences of a "habitual offender" conviction, *see **State v. Setzer***, 20 Wash. App.

46, 579 P.2d 957, *petition for review denied,* 90 Wash. 2d 1025 (1978), and (c) holding out that the defendant's confession cannot be used against him at trial, *see Commonwealth v. Dustin,* 373 Mass. 612, 368 N.E.2d 1388 (1977), *cert. denied,* 435 U.S. 943, 98 S. Ct. 1523, 55 L. Ed. 2d 540 (1978), and (6) misrepresentations by an interrogating police officer, who is a close friend of the defendant, that the defendant's failure to confess will get the officer into trouble with his superiors and jeopardize the well-being of the officer's pregnant wife and children, *see Spano v. New York,* 360 U.S. 315, 79 S. Ct. 1202, 3 L. Ed. 2d 1265 (1959).

Because Detective Kim's deliberate misrepresentations to Kelekolio were intrinsic to the facts of the present offenses and because we determine from the totality of the circumstances surrounding Kelekolio's audiotaped statement, based on our review of the entire record, that the misrepresentations were not of a type that would reasonably induce a false confession, we hold that Detective Kim's use of deception did not render Kelekolio's inculpatory statements involuntary.

Notwithstanding our holding, we emphasize that we are not purporting to enunciate a bright line *per se* rule that the use of intrinsic factual deception cannot, given the totality of circumstances surrounding any given statement, result in an involuntary confession. Rather, the rule that we formulate today merely declines to foreclose the admissibility of confessions, as a *per se* matter, procured in part through the use of this kind of deception. Such confessions remain subject to "totality of circumstances" analysis, *see Villeza,* 72 Haw. at 330–31, 817 P.2d at 1056, and may still be the product of interrogation techniques that are " 'so offensive to a civilized system of justice' " that " 'they must be condemned' " under

principles of due process, *see Crane*, 476 U.S. at 687–88, 106 S. Ct. at 1245.[17]

## 2. Jury Instructions

In light of the discussion and holding in section II. A. 1. c of this opinion, Kelekolio's contentions that the trial court committed plain error in giving State's Supplemental Instruction No. 11 and erred in giving State's Supplemental Instruction No. 12 over Kelekolio's objection are without merit.

Relying on *State v. Foster*, 44 Haw. 403, 354 P.2d 960 (1960), and *Crane v. Kentucky*, *supra*, Kelekolio also urges, however, that the jury instructions as a whole were "prejudicially insufficient" because "the [trial] court never instructed the jury on the issue of the voluntariness of [his] confession," thus depriving the jury of the opportunity "to make the ultimate determination of whether [his] confession was freely and voluntarily made." Opening brief at 21–22. Specifically, Kelekolio complains that "the jury was never . . . told that it could reject [his] confession if it found the confession to be involuntary." *Id.* at 31.

When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when

---

[17] As an example of the latter, *see State v. Cayward*, 552 So. 2d 971, 972–74 (Fla. Dist. Ct. App. 1989), *review dismissed*, 562 So. 2d 347 (1990) (confession extracted from sex–assault defendant through use of police–fabricated "scientific" reports purporting to establish that semen stains on victim's underwear came from defendant; court ruled that use of such "falsely contrived scientific documents" brought to mind "the horrors of less advanced centuries in our civilization when magistrates at times schemed with sovereigns to frame political rivals," being "precisely one of the parade of horribles civics teachers have long taught their pupils that our modern judicial system was designed to correct" and thereby offending "traditional notions of due process of law").

read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading. *State v. Halemanu*, 3 Haw. App. 300, 306, 650 P.2d 587, 592 (1982) (citing, *inter alia*, *State v. Reiger*, 64 Haw. 510, 644 P.2d 959 (1982)).

We note that Kelekolio never requested an instruction on the issue of voluntariness; he therefore alleges plain error on appeal. This court's power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system — that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes. *State v. Fox*, 70 Haw. 46, 55–56, 760 P.2d 670, 675–76 (1988). Nevertheless, where plain error has been committed and substantial rights have been affected thereby, the error may be noticed even though it was not brought to the attention of the trial court. *Id.* at 55, 760 P.2d at 675; *see also State v. Grindles*, 70 Haw. 528, 530, 777 P.2d 1187, 1189 (1989); *State v. Tiedemann*, 7 Haw. App. 631, 635, 790 P.2d 340, 342 (1990); Hawaii Rules of Penal Procedure (HRPP) 52(b) (1989); Hawaii Rules of Evidence (HRE) 103(d) (1985). Given the current confused state of Hawaii case law regarding the jury's proper role in determining the voluntariness of a defendant's confession, we choose to take this opportunity to clarify the matter.

"That the jury is to pass upon the facts and the [c]ourt upon the law[] is a principle which lies at the foundation of jury trial in every country blessed with [that] institution[.]" *Lewis v. Davis*, 1 Haw. 248, 249 (1854).[18] Correla-

---

[18] This proposition is so intuitively obvious that an "archaeological dig" to the very foundation of our jurisdiction's formal jurisprudential civilization was required to find a clear articulation of it in the reported

tively, the admissibility of evidence is a question of law for the trial judge to determine. *Territory v. Buick*, 27 Haw. 28, 52 (1923); *see also* HRE 104(a) (1985) ("Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court"). On the other hand, "[t]he jury, as the trier of fact, is the sole judge of the credibility of witnesses [and] the weight of the evidence." *State v. Tamura*, 63 Haw. 636, 637–38, 633 P.2d 1115, 1117 (1981) (citations omitted); *State v. Summers*, 62 Haw. 325, 332, 614 P.2d 925, 930 (1980) (citations omitted).

"Whether a confession is voluntary is . . . a mixed question of law and fact. And where [the trial judge conducts a hearing] to determine the admissibility of a confession, it becomes the duty of the [trial judge] to find the facts and to apply . . . the *legal tests of admissibility*." *Territory v. Young*, 37 Haw. 189, 193 (1945) (footnote omitted and emphasis added). Accordingly, "[h]earings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury." HRE 104(c) (1985). Nevertheless, a defendant retains the right to put before the jury, as the trier of fact, all evidence, including the facts and circumstances surrounding the making of his confession, "relevant to weight or credibility." HRE 104(e) (1985).

The United States Supreme Court aptly consolidated the foregoing principles in *Crane v. Kentucky*, *supra*, as follows:

> [T]he Court has never questioned that "evidence surrounding the making of a confession bears on its credibility" as well as its volunta-

---

case law. The author of this opinion begs the world's indulgence in noting that the present case has accorded him his first (and perhaps last) opportunity in his entire legal career to cite 1 Haw. as authority.

riness. . . . [B]ecause *"questions of credibility, whether of a witness or of a confession, are for the jury,"* the requirement that the court make a pretrial *voluntariness* [emphasis in original] determination does not undercut the defendant's traditional prerogative to challenge the confession's *reliability* [emphasis in original] during the course of the trial. . . . Thus, . . . evidence about the manner in which a confession was secured will often be germane to its probative weight, a matter that is exclusively for the jury to assess.

. . . [T]he circumstances surrounding the taking of a confession can be highly relevant to *two separate inquiries, one legal and one factual. The manner in which a statement was extracted is,* of course, *relevant to the purely legal question of voluntariness . . . . But the* physical and psychological *environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence.* Confessions, even those that have been found to be voluntary, are not conclusive of guilt. And, as with any other part of the prosecutor's case, *a confession may be shown to be "insufficiently corroborated or otherwise . . . unworthy of belief." . . .* Indeed, stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question that every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt? Accordingly, . . . *entirely independent of any question of voluntariness, a defendant's case may rise or fall on his ability to convince the jury that the*

> *manner in which the confession was obtained casts doubt on its credibility.*

476 U.S. at 688–89, 106 S. Ct. at 2145–46 (citations omitted and additional emphasis added).

Over the course of time, this court has lost sight of the distinction between the need for the trial court, as the judge of the law, to assess the manner in which a confession or inculpatory statement is extracted, for purposes of resolving the "purely legal question" of *admissibility* (*i.e.*, whether the confession or inculpatory statement was voluntarily given), and the prerogative of the jury, as the judge of the facts, to determine the *weight and effect* of the confession or inculpatory statement with regard to its *credibility and reliability* (*i.e.*, its worthiness of belief) within the context of "the ultimate factual issue of the defendant's guilt or innocence." *See Crane*, 476 U.S. at 688–89, 106 S. Ct. at 2145–46.

Thus, misconstruing **Territory v. Alcosiba**, 36 Haw. 231, 235 (1942), this court declared in *Young* that

> in this jurisdiction the rule has been recognized that although a court may, upon a hearing preliminary to the admission of a confession in evidence, determine that the confession was freely and voluntarily made[,] where the evidence is conflicting, the ultimate determination of its voluntary character is for the jury.

37 Haw. at 193. Unfortunately, we have perpetuated this legal misconstruction in subsequent cases. *See, e.g., State v. Foster*, 44 Haw. 403, 419, 354 P.2d 960, 969 (1960), and **State v. Smith**, 59 Haw. 565, 568, 583 P.2d 347, 350 (1978). Accordingly, as a corrective step, we now overrule *Young, Foster, Smith*, and any other Hawaii decision in accord with them, insofar as they conflict with the

rationale of *Crane*, and expressly adopt the reasoning of *Crane* cited above.

During the trial of the present case, Kelekolio was never precluded from adducing relevant evidence of the circumstances surrounding his interrogation, and, as noted above, he did so. Moreover, the trial court's instructions to the jury (including those of which Kelekolio now complains) advised the members of the jury that: (1) they were the exclusive judges of the facts; (2) they were not bound to give every bit of evidence the same weight, but rather were to make their own determination of the effect and value of the evidence and the credibility of the witnesses; (3) they had the exclusive right to determine whether and to what extent each witness was worthy of belief and to give weight to each witness's testimony accordingly, based, *inter alia*, on the witness's candor or frankness (or lack thereof), the extent of support or contradiction by other evidence, the extent of contradictory statements in trial or at other times, and all other circumstances surrounding the witness and bearing upon his or her credibility; and (4) the use of deception should be considered in assessing both the reliability and trustworthiness of Kelekolio's statement and the likelihood that such "trickery" produced a false confession.

We are convinced that the jury instructions, when read and considered as a whole, did not bind the jury to accept any or all of Kelekolio's audiotaped statement to Detective Kim merely because it had been deemed legally admissible. The instructions expressly and impliedly enjoined the jurors to consider the totality of the circumstances under which the statement was made, including the conduct and statements of Detective Kim in the course of the interview. And to the extent that the totality of the circumstances diminished or cast doubt on the

trustworthiness of Kelekolio's statement, the instructions entitled the jury to reject or disregard the statement accordingly, except insofar as it was corroborated by other credible evidence or, in light of all the evidence, believed by the jury to be true. We therefore hold that the jury instructions, when read and considered as a whole, were not prejudicially insufficient, erroneous, inconsistent, or misleading.

## B. **Evidence of the Complainant's Fantasies**

Kelekolio next contends that the trial court erred in "excluding evidence of the complainant's fantasies during her cross–examination, Kelekolio's direct examination, and the examination of [other] witnesses." Opening brief at 17–18. "Evidence of the complainant's fantasies was central to the defense case," Kelekolio legitimately argues, because "[i]f the jury believed that the complainant fantasized many events in her life, then it would also be inclined to believe that she fantasized the events concerning Kelekolio." *Id.* at 30.

This court has recently concluded that:

[D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

*Kealoha v. County of Hawaii*, 74 Haw. 308, 319–20, 844 P.2d 670, 676 (1993).

Kelekolio is "right" that the complainant's alleged statements to him would not constitute hearsay if not offered for their truth, but rather to show that they were untrue and that the complainant was merely verbalizing fantasies. *See supra* at 8–14; *see also Kealoha*, 74 Haw. at 317–18, 844 P.2d at 675. Moreover, we agree with Kelekolio that, as a threshold matter, such evidence is not barred by HRE 412, which is specifically designed to protect alleged sexual assault victims from being impeached by evidence of past sexual *conduct*, as distinguished from past sexual *cognition*. *Cf. id.* ("Because the only question . . . is whether the specific requirements of the [evidentiary] rule were met, there can be no discretion in the trial court.")[19]

---

[19] *See supra* note 7. Although HRE 412(d) defines "past sexual behavior" to mean "sexual *behavior* other than the sexual *behavior* with respect to which sexual assault is alleged" (emphasis added), the term "behavior" is nowhere defined. The Hawaii Rules of Evidence, as amended, were created by the legislature via HRS ch. 626 and are therefore statutory.

> This court has often stated that "[t]he fundamental starting point for statutory interpretation is the language of the statute itself. . . . [W]here the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning." . . . Where . . . the operative language . . . is undefined in a statute, we presume that the words in question "were used to express their meaning in common language."

*Schmidt v. Board of Directors of Ass'n of Apartment Owners of Marco Polo Apartments*, 73 Haw. 526, 531–32, 836 P.2d 479, 482 (1992) (citations omitted).

Kelekolio is mistaken, however, when he ascribes the exclusion of anticipated evidence of the complainant's habitual propensity to fantasize sexually[20] to the trial court's granting of the prosecution's motion *in limine.* Opening brief at 18. Whenever Agmata laid a proper foundation, the court recognized the distinction between "fantasy" evidence and evidence of "past sexual behavior" properly excluded by the motion *in limine.* Any mistaken impression that Agmata was seeking to adduce evidence of the complainant's past sexual behavior could and should have been dispelled by the simple expedient of an

---

Moreover, " '[w]hen there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute an ambiguity exists.' . . . If the statutory language is ambiguous or doubt exists as to its meaning, '[c]ourts may take legislative history into consideration in construing a statute.' " *Kaapu v. Aloha Tower Dev. Corp.*, 74 Haw. 365, 387, 846 P.2d 882, 891 (1993) (citing *Franks v. City and County of Honolulu*, 74 Haw. 328, 334–35, 843 P.2d 668, 671–72 (1993) (citations omitted)).

Sen. Stand. Comm. Rep. No. 22–82, in 1980 Senate Journal, at 12, notes that "[r]ule 412 pertains to the admissibility of [the sexual assault] victim's past sexual *conduct.*" (Emphasis added.) BLACK'S LAW DICTIONARY 295 (6th ed. 1990) defines "conduct" in relevant part as "mode of *action*; any positive or negative *act.*" (Emphasis added.) "Act" is defined, *inter alia*, to "[d]enote[] [the] external manifestation of [the] actor's will." *Id.* at 25. "Action" is defined, *inter alia*, as "something done." *Id.* at 28.

Accordingly, we believe that the term "behavior," as employed in HRE 412, was not intended in its "common language" sense to include mere cognition, such as sexual fantasizing. The threshold admissibility of such "cognition" evidence would be governed by the general rules of relevance. *See* HRE 401, 402, and 403 (1985). Evidentiary rulings pursuant to HRE 401 and 402 would be reviewed under the right/wrong standard, *see Kealoha*, 74 Haw. at 319–20, 844 P.2d at 674, and rulings pursuant to HRE 403 would be reviewed under the abuse of discretion standard, *see id.* at 323, 844 P.2d at 677.

[20] *See supra* note 9.

offer of proof.[21] In the absence of an offer of proof, the trial court committed no reversible error.

### C. **The Complainant's Competency to Testify**

As an additional point of error on appeal, Kelekolio alleges that Agmata was ineffective for failing to move for a hearing to determine the complainant's competency to testify at trial on the ground that "there was clearly an issue as to whether [she] understood the duty to tell the truth . . . and was thus competent to testify under HRE 603.1." Opening brief at 23–24.[22]

Kelekolio's position presupposes that Agmata's silence betokened an error or omission reflecting a lack of skill, judgment, or diligence that resulted in the withdrawal or impairment of a potentially meritorious defense. *State v. Aplaca*, 74 Haw. 54, 66–67, 837 P.2d 1298, 1305 (1992) (footnote and citations omitted). However, " '[t]he decision whether to call witnesses in a criminal trial is normally a matter within the judgment of counsel and, accordingly, will rarely be second–guessed

---

[21] *See supra* note 1. HRE 103(a) provides in relevant part:

Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of a party is affected, and:

. . . .

(2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

"The offer should incorporate a coherent theory of admissibility, grounded in a designated rule or rules, together with case law and other authority as appropriate, plus a proffer covering the nature and substance of the evidence." *Hawaii Rules of Evidence Manual* § 103–3A, at 13.

[22] *See supra* note 12 for the text of HRE 601 and 603.1.

by judicial hindsight.' " *Id.* at 70, 837 P.2d at 1307 (quoting *State v. Onishi*, 64 Haw. 62, 64, 636 P.2d 742, 744 (1981)) (other citations omitted).

In the present case, there is, of course, no record of Agmata's thought processes. But the inference may nevertheless be drawn that Agmata made a tactical decision that, faced with Kelekolio's confession in evidence, it was the lesser of two evils for the jury to observe the complainant's demeanor and manner of testifying in order to bolster the defense that she fantasized the incident in question. Attorneys "require and are permitted broad latitude to make [such] on–the–spot strategic choices in the course of trying a case . . . ." *State v. Smith*, 68 Haw. 304, 311, 712 P.2d 496, 501 (1986) (citations omitted).

Notwithstanding the foregoing and for the reasons set forth below, we believe that the trial court, *sua sponte*, should have conducted a competency hearing prior to exposing the complainant's substantive testimony to the jury — regardless of the trial tactics of the parties — and that it was plain error for the court to have failed to do so.

We begin our analysis with the dual propositions that "[e]very person is competent to be a witness except as otherwise provided in [the HRE]," HRE 601, and that "[a] person is disqualified to be a witness if [s]he is . . . incapable of understanding the duty of a witness to tell the truth," HRE 603.1. Not surprisingly, HRE 603.1 is "primarily applicable to youthful and mentally infirm witnesses." Bowman, *The Hawaii Rules of Evidence*, 2 U. HAW. L. REV. 431, 453 (1981). In this regard, the commentary on HRE 603.1 (1985) indicates that the rule was intended to codify Hawaii's common law:

> The intent of this rule . . . is to . . . *require* disqualification of witnesses whose incapacity . . . to

understand the truthtelling obligation renders their testimony valueless.

Under this rule the competency of a witness is a matter for determination by the court. . . .

This rule generally restates existing Hawaii law . . . [and reflects] a liberalization of the competency standard for children. In **Republic v. Ah Wong**, 10 Haw. 524, 525 (1896), the court said: "There is no precise age within which children are excluded from testifying. Their competency is to be determined, not by their age, but by the degree of their knowledge and understanding."

In **Territory v. Titcomb**, 34 Haw. 499, 502 (1938), the court announced that "the proper test must always be, does the lunatic understand what he is saying, and does he understand the obligation of an oath? . . . [I]f he can understand the test proposed, the jury must determine all the rest." Rule 603.1 is consistent with the *Ah Wong* and *Titcomb* decisions.

(Emphasis added.)

In light of the uncontroverted testimony that the complainant functions at the cognitive level of a four– to seven–year–old child, Professor Bowman's observations regarding "factors peculiar to young children" are particularly enlightening:

> There is . . . a necessity that the child have *cognitive skills adequate to comprehend the event he or she witnessed and to communicate memories of the event in response to questions at trial.* If a child's view of the truth bears little resemblance to reality, it will also have little value to

the trier of fact. Thus, competency to testify implies some measure of competency at the time of the event witnessed as well as at the time of the trial. *The child must be able to organize the experience cognitively and to differentiate it from his or her other thoughts and fantasies.* Furthermore, the child must be able to maintain these skills under psychological stress and under pressure, real or perceived, from adult authority figures to shape his or her responses in a particular way. Thus, level of suggestibility is an important factor. Particular kinds of testimony may require further specific competencies. Most notably, testimony by children on sexual abuse may require verification of the child's comprehension of the meaning of sexual terms and behavior.

Melton, *Children's Competency to Testify*, 5 Law & Human Behavior 73, 75 (1981). Melton's article summarizes the psychological research on memory, cognition, moral development, and suggestibility of children. He concludes that "the available research in sum suggests that liberal use of children's testimony is well founded." *Id.* at 81. The best approach in borderline cases is to admit the testimony, rely on adversary presentation and cross–examination, and exercise judicial control in testing the sufficiency of the evidence.

*Hawaii Rules of Evidence Manual* § 603.1–2A, at 214 (emphasis added).

The relevant legislative history "makes clear [that] [R]ule 603.1 is not a discretionary disqualification."

*Hawaii Rules of Evidence Manual* § 603.1–2, at 213; *see also* HRE 104(a) (1985) ("Preliminary questions concerning the qualification of a person to be a witness . . . *shall* be determined by the court . . . .") (emphasis added)). And "the legislative intent and the language of the rule contemplate a single "right/wrong" review standard . . . ." *Hawaii Rules of Evidence Manual* § 603.1–2B, at 215.

> Rule 603.1 disqualifies anyone incapable of expressing himself or unable to tell the truth from being a witness. The language of S.B. No. 1827–80, S.D. 1, H.D. 1 made it discretionary upon the court to qualify or disqualify a witness for such reasons. We have concluded that the mandatory language previously found in S.B. No. 1827–80, S.D. 1 is more appropriate. By such reversion in language, it is the intent that when the question is properly appealed, the appellate court should review the record to determine whether the trial court has erred in its determination and that *the question so raised on appeal should not be determined based on whether the trial court had abused its discretion. It was concluded that a witness is either qualified or disqualified, and it is not a matter of degrees.*

Sen. Conf. Comm. Rep. No. 80–80, in 1980 Senate Journal, at 996 (emphasis added). We therefore review the trial court's failure in the present case to conduct a competency hearing as to the complainant, pursuant to HRE 603.1, under the "right/wrong" standard.[23]

---

[23] Consistent with the applicability of the "right/wrong" standard of review, we overrule any Hawaii decisions, such as ***Territory v. Titcomb***, 34 Haw. at 503 (applying the "clearly erroneous" standard of

In the present case, the trial court either made no finding of competency or adjudged the complainant to be competent *sub silentio*. However, our *de novo* review of the record persuades us that there was an inadequate showing of competency for the following reasons: (1) when asked whether lying was good or bad, the complainant responded, "Good"; (2) the complainant was unable to identify Kelekolio, who was present in court, although she repeatedly referred to him in her testimony by name; and (3) the complainant did not appear to understand the meaning of particular sexual and other terms (*i.e.*, "rape" and "kidnap") that she employed in her testimony.

We recognize that it is by no means certain that a competency determination by the trial court, pursuant to HRE 603.1, would result in the complainant's disqualification to testify. For example, the court in *State v. Gonsalves*, 5 Haw. App. 659, 706 P.2d 1333 (1985), although utilizing an improper standard of review, held that it was not error to allow a mentally retarded twenty–eight–year–old sex assault complainant, who had an IQ of 40 and functioned cognitively at the level of a three– to four–year–old child, to testify. *Id.* at 666, 706 P.2d at 1339. Therefore, the question of testimonial competency must be determined on a case by case basis. We merely hold, on the record before us, that (1) the issue of the complainant's competency to testify was reasonably called into question; and (2) the trial court committed plain error in failing to engage in an independent inquiry and make an express finding as to whether the complainant was competent to

---

review), and *State v. Gonsalves*, 5 Haw. App. 659, 665, 706 P.2d 1333, 1338–39 (1985) (applying the "abuse of discretion" standard of review), to the extent that they hold that the issue of competence to testify is to be reviewed under a different standard of review.

testify before allowing her substantive testimony to be exposed to the jury.[24]

The question thus arises as to whether the trial court's plain error was harmless. In order to answer in the affirmative, we would have to conclude beyond a reasonable doubt that Kelekolio's inculpatory statements were such that the complainant's testimony could not have affected the jury's verdicts. *See Russo*, 67 Haw. at 138–39, 681 P.2d at 562–63 (1984). Inasmuch as, standing alone, the jury may have given little weight and effect to Kelekolio's inculpatory statements (the only other direct evidence of his guilt) in light of the totality of the circumstances under which they were obtained, we cannot.

## III. CONCLUSION

Because we hold that the trial court committed plain error in failing to make an express determination of the complainant's competence to testify, and because we are not convinced beyond a reasonable doubt that the error was harmless, we vacate Kelekolio's convictions and remand for a new trial.

*Joyce K. Matsumori–Hoshijo*, Deputy Public Defender, for defendant–appellant John Anthony Kelekolio.

*Doraine Meyer Belnap*, Deputy Prosecuting Attorney, for plaintiff–appellee State of Hawaii.

---

[24] In accordance with HRE 104(c), whether a HRE 603.1 hearing should be conducted *in camera* is a matter within the sound discretion of the trial court. *Hawaii Rules of Evidence Manual* § 603.1–2D, at 216–17.