117 P.3d 856

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Jeffrey GRAY, Defendant–Appellant.**

No. 26520.

Intermediate Court of Appeals of Hawai'i.

July 1, 2005.

Pamela E. Tamashiro, on the briefs, for defendant-appellant.

Artemio C. Baxa, Deputy Prosecuting Attorney, County of Maui, on the briefs, for plaintiff-appellee.

BURNS, C.J., LIM and FUJISE, JJ.

Opinion of the Court by LIM, J.

Jeffrey Lee Kalani Gray (Gray) appeals the March 19, 2004 judgment of the Circuit Court of the Second Circuit (circuit court)[1] that convicted him of promoting a dangerous

---

1. The Honorable Joel E. August presided.

drug in the third degree (count one),[2] unlawful possession of drug paraphernalia (count two)[3] and prohibited possession of firearm ammunition by a felon (count six).[4]

We hold that in a prosecution under Hawaii Revised Statutes (HRS) § 134–7(b) (1993 & Supp.2004), a police officer's authoritative identification of firearm ammunition is substantial evidence that the ammunition is actually loaded, *State v. Irebaria*, 55 Haw. 353, 358, 519 P.2d 1246, 1249 (1974), in the absence of evidence that the ammunition is unloaded or otherwise incapable of being fired. *State v. Padilla*, 57 Haw. 150, 157, 552 P.2d 357, 362 (1976). We therefore affirm.

## I. Background.

On February 10, 2003, Gray was indicted, "as a principal and/or an accomplice," for promoting a dangerous drug in the third degree (methamphetamine in any amount) in count one, possessing drug paraphernalia ("a plastic beam scale, a metal box, plastic ziploc packets, and/or a cut playing card") in count two and attempting to promote a detrimental drug in the first degree (attempted distribution of one-eighth ounce or more of marijuana) in count three. Gray was also indicted for promoting a dangerous drug in the third degree (methamphetamine in any amount) in count four, possessing drug paraphernalia ("a plastic ziploc packet") in count five and being a felon in possession of firearm ammunition ("two (2) .40 caliber rounds of ammunition") in count six.

Before the jury trial, Gray moved *in limine*, noting as follows:

> At the police station, Gray waived his Miranda rights and gave a statement. With regards to the statement, the police reports [sic] says:

**2.** Hawaii Revised Statutes (HRS) § 712–1243(1) (1993 & Supp.2004) provides: "A person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount."

**3.** HRS § 329–43.5(a) (1993) provides, in pertinent part: "It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce,

> GRAY stated that he bought the Nissan truck (MWM 645) for $250.00 from YAMANE about a week ago. Stated that he was getting marijuana from CAMANSE when he was approached. I asked GRAY if he smoked crystal methamphetamine, he stated that he "partied" with "ice" once in a while (ice—crystal methamphetamine, street name) I asked if there [sic] any drug in the truck he said he didn't know.

(Capitalization and punctuation in the original.) Gray went on to argue, in his motion *in limine* number four:

> The police state that part of Mr. Gray's response to questioning was: **"I asked GRAY if he smoked crystal methamphetamine, he stated that he "partied" with "ice" once in a while (ice—crystal methampheatmine, street name)."** Instead of asking him if he smoked any of the "ice" found in the car, he was apparently asked a general question as to whether he smoked it. Both the question and response merely go to Mr. Gray's propensity to smoke ice, not whether he actually did so in this case. As such it is improper character evidence under [Hawaii Rules of Evidence Rule] 404. In addition, any probative value of this statement is far outweighed by its prejudicial effect. Therefore, the court should bar the State from introducing the above part of Mr. Gray's statement to the police.

(Bolding, capitalization and punctuation in the original.) After hearing motions *in limine*, the circuit court ruled:

> With regard to the motion in limine number four having to do with statements, that looks like it is going to be the subject of a—well, part of it is going to have to be the subject of a motion in limine [sic; presumably, a voluntariness hearing].

process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter."

**4.** HRS § 134–7(b) (1993 & Supp.2004) provides, in relevant part: "No person who ... has been convicted in this State or elsewhere of having committed a felony, ... shall own, possess, or control any firearm or ammunition therefor."

The other part which has to do with Mr. Gray allegedly stating that he partied with ice once in awhile in response to a question about whether he smoked crystal methamphetamine, the court is going to grant that portion with the understanding that if Mr. Gray takes the stand and opens the door to his prior knowledge of what ice looks like, or whether he has ever used it or not, that you could impeach him.

The evidentiary part of the trial started and ended on November 12, 2003. At the outset, the circuit court read the following stipulation to the jury:

1. That the Defendant, Jeffrey Gray, prior to December 6, 2000, was convicted of a felony offense in the State of Hawaii;

2. That the Defendant, Jeffrey Gray, as a convicted felon, could not own, possess, or control any firearm ammunition and he was made aware that he could not own, possess, or control any firearm ammunition;

3. That prior to and on December 6, 2000, the Defendant, Jeffrey Gray, had knowledge that, as a convicted felon, it was illegal for him to own, possess, or control any firearm ammunition; and

4. That the Defendant, Jeffrey Gray, is also known as "German".

The ensuing testimony, briefly summarized, revealed the following.

On December 6, 2000, three Maui Police Department officers, in mufti, were staking out the pay phone area of the Maui Grown Market located at Ulumalu Road and Hana Highway in Ha'iku. At about 5:20 p.m., the police officers saw Gray drive up in a standard-cab pickup truck. With Gray in the truck was Debra Robertson (Robertson). Gray got out and met a man at the pay phone and gave him something. According to the officers, the transaction appeared to be a drug "hand-off." The officers detained Gray as he was walking back to his truck. They also stopped the other man, Douglas Camanse (Camanse). A small amount of marijuana was recovered from Camanse's hand.

At this point in the testimony, the circuit court excused the jury and held a voluntariness hearing on certain statements Gray made to the police. One of the officers, Detective William Gannon (Detective Gannon), testified that when he first approached and detained Gray, he questioned Gray, but did not first read him his Miranda rights. Detective Gannon asked Gray who owned the pickup truck. Detective Gannon also asked Gray whether he owned anything in the truck. Gray told Detective Gannon that he did not own the truck, but that a backpack in the bed of the truck was his. Gray also acknowledged ownership of a wallet on the dashboard. At the police station later that evening, Detective Gannon interrogated Gray again. This time, Detective Gannon advised Gray of his Miranda rights before questioning him.

In argument on voluntariness, defense counsel asked the circuit court to "suppress the statements in the field prior to the Miranda where Mr. Gray admits this bag is his. . . . As far as what he said afterwards, I also agree that was Mirandized and we're not asking for that to be suppressed except for the portion already granted in the motion in limine." The circuit court decided: "I am going to suppress the statements made at the scene of the arrest relative to any incriminating activity. Particularly in this case we're dealing with ownership, his ownership of the backpack and the wallet."

Continued testimony before the jury revealed more about the drug bust. After Gray was detained, a K–9 police dog named Niki alerted to the truck, which indicated the presence of a "controlled substance." At that point, Gray and Robertson were arrested. The police obtained a search warrant for the truck. The truck was towed to the police station and the warrant was executed the next day.

The police found a plastic beam scale in the middle of the bench seat of the truck. The scale had a "crystal-like residue" in its bowl. Also found on the bench seat was a compact disk with "Debra and German" written on it, next to several pieces of mail addressed to "Debra Robertson" and "Kapili Gray." The ashtray contained a silver .40 caliber bullet, some marijuana and a small ziploc packet housing .145 grams of a sub-

stance containing methamphetamine. The glove box contained a metal box—in which the police found numerous unused yellow ziploc packets, a pink ziploc packet with white crystalline residue in it and a folded playing card cut in the shape of a trapezoid—along with another .40 caliber bullet, this one brass in color. In the bed of the truck was a backpack, in which the police found a blue ziploc packet containing .001 grams of a substance that tested positive for the presence of methamphetamine.

During the direct examination of Detective Gannon about the items found in the truck, the following colloquies occurred:

Q. I'd like to start with S-4 and show the jury S-4 and describe what it is and what evidentiary value is found in there?

A. Okay. S-4 depicts the ashtray pulled open. Within the ashtray we recovered small zip-lock packets possessing .14 grams of—

. . . .

A. Small zip-lock pocket [sic] possessing suspected crystal methamphetamine.

Q. What else was in there?

A. Green vegetation suspected of being marijuana and a silver in color .40 caliber unspent bullet, meaning hasn't been fired.

Q. How about S-6?

A. Yes. S-6 this photo depicts the glove box opened up. On the far right-hand side there's a metal container that's of interest. It is closed. At the time its contents possessed several new unused zip-lock packets, a folded playing card. If you were to play, you know, a deck of cards, folded in half which is used, and also in the glove box is brass in color unspent .40 caliber bullet.

. . . .

Q. Showing you State's Exhibit 23 and 24. Do you recognize those?

A. Yes.

Q. What are they?

A. They are both .40 caliber unspent bullets, ammunition. One is silver in color. Other is brass in color.

. . . .

Q. I'm sorry, and you testified that you recovered one from the ashtray and one from the glove box?

A. Yes.

Q. When you say bullets, do you mean ammunition to be put in a .40—would it be a pistol that would be used or revolver?

[DEFENSE COUNSEL]: Objection, lack of foundation.

THE COURT: I'll sustain the objection. It is also leading.

Q. Are you familiar with ammunition and how it is used?

A. Yes.

Q. And particularly .40 caliber ammunition, how are you familiar with it?

A. Because it is the type of weapon I am issued and I am certified to use.

Q. Okay, and this .40 caliber ammunition, what type of gun that you are familiar with could it be used in?

[DEFENSE COUNSEL]: Objection. Still lack of foundation as to—

THE COURT: I'll permit him to ask if it is based upon his knowledge of what he is familiar with that he has actually used or studied?

A. Glock models 23 and 27.

Q. Those are the same type of weapons you are issued as police officer?

A. Yes, I am.

Q. Does the color of the casing on the ammunition make a difference, the brass and the silver color as far as being able to use in a gun?

A. In being able to use, no.

After Officer Gannon completed his testimony, the jurors submitted a number of questions for him. Of initial interest was a juror's query relating to the registration of the truck:

THE COURT: . . . . Question Number 6a through 6d. 6a is who was the vehicle registered to.

[DEFENSE COUNSEL]: No objection.

[DEPUTY PROSECUTING ATTORNEY (DPA)]: It is going to open up a whole new area of questioning. Going to go into the warning and waiver of statement to the warning and waiver of the

statement to the officer, which is going to open up whole new line of questioning.

THE COURT: I think it is a reasonable question. It is not inherently prejudicial.

[DPA]: Just so long as the court understands it is going to open up a whole new area.

THE COURT: I am not sure it has to open up a whole new area. He can—really asked what did he look at to determine that.

[DPA]: I think the issue then it becomes a question—it implies not registered to him.

THE COURT: I don't—

[DPA]: I don't know if the officer knows, first of all, but if he knows it was registered to him, so I would be asking the officer to clarify how did he determine defendant's—

THE COURT: I don't think that you need to get into any questions as a result of him responding to this question which had to do with his interrogation of Mr. Gray. You can ask him what documents he looked at to determine that.

[DPA]: But for proof of my case I would want to because then it would draw on the question if not registered to him, why would they assume he was owner. Defendant said he was owner. The defendant said he owned the vehicle in the statement to the officer, although it is not registered to him.

THE COURT: Well, the question is not who owned it. The question is who is it registered to.

[DPA]: I know, your Honor. It is just going to open up that area.

THE COURT: It is not going to open up the area. If he answers somebody else other than defendant, you are entitled to ask him what documents he looked at to determine that, and he can answer that without having to get into a whole lot of questions from defendant about his interrogation.

[DPA]: I would want to.

THE COURT: I know you would want to.

[DPA]: If the Court is not going to allow it, I have to object. The court is purposely not letting the State—blocking the State from counteracting the questions from the jury.

THE COURT: That's fine. What you are trying to get into is the inference and I'm not going to allow you to get into that because it is violative of what the order was previously.

[DPA]: Your Honor, the court has to allow it. It is not fair to the State. You are not giving the State a fair trial. What you are doing, you are going to give the implication if he knows the car is not registered to him, but he knows defendant told him he had purchased the vehicle, which I purposely didn't get into.

THE COURT: [DPA], you can purchase a vehicle and still not get any registration. The question is who is it registered to. I'm not going to permit you to get into that.

[DPA]: Your Honor, you have to let me. This isn't fair to the State, judge.

THE COURT: It is not right because you're intentionally trying to open the door to something which is going to be highly prejudicial.

[DPA]: It is highly prejudicial to the State—

THE COURT: It is not.

[DPA]:—not to let the State ask questions.

THE COURT: Put your objections on the record. I told you that you can ask questions. You can't ask the questions you want to ask. If you want to ask him what documents he looked at to determine that, you can ask him the question if he knows.

[DPA]: But he knows based upon defendant telling him he purchased the vehicle, and the court said the court was going to allow that question. State chose to get into—the State now chose to get into it.

THE COURT: [DPA], your objection is on the record.

Moments later, however, the circuit court reconsidered:

[DEFENSE COUNSEL]: You are just going to ask 6a?

THE COURT: I am just wondering what 6a, in terms of the vehicle being registered, do you know who the vehicle was registered to?

[DEFENSE COUNSEL]: Yes. It is in the reports.

[DPA]: It is registered to the mother and the step-father of the lady. In his statement he bought it from Janyce Yamane, who is the daughter of Roseline Yamane.

THE COURT: Are the Yamane girls going to be testifying here relative to the ownership of the vehicle?

[DEFENSE COUNSEL]: I think he subpoenaed them.

[DPA]: If this question is allowed, they might. I was trying to avoid that whole area. That was what I was trying to avoid. The actual owner of the vehicle is in Honolulu. She's quite elderly. The daughter defendant claims he bought it from was actually not the registered owner of the vehicle. I don't know what authority she had to supposedly sell it to the defendant.

THE COURT: I have decided I am not going to ask 6a. I am not going to ask it.

[DEFENSE COUNSEL]: That's fine. I defer.

THE COURT: That is getting into areas quite frankly are going to raise—reversible error, factual issues, so I'm not going to ask any of the 6 series.

Consequently, one other juror question about the registration of the truck and two juror questions about the ownership of the truck were not posed to Detective Gannon.

At the close of the State's case, Gray brought an oral motion for judgment of acquittal on all counts of the indictment. The circuit court denied the motion, except with respect to count three, the language of which the circuit court found defective. The State did not object to acquittal on that count. The next day, the circuit court filed a judgment of acquittal in count three.

Gray did not testify or present any evidence of his own. In closing argument, defense counsel questioned the diligence of the police in their investigation of the pivotal issue of possession of the items found in the truck. For example, defense counsel queried, rhetorically, why the police did not dust the ashtray or the glove box for fingerprints. Defense counsel also argued: "There's a few other questions. Whose car was it? You haven't heard any evidence of whose car it was." On November 14, 2003, after about a day of deliberations, the jury found Gray guilty on all remaining counts of the indictment.

On November 24, 2003, Gray filed a post-verdict motion for judgment of acquittal on counts four and six. As to count four, Gray asserted that his possession of the .001 grams of methamphetamine in the ziploc packet found in the backpack in the bed of the pickup truck was a *de minimis* infraction under HRS § 702–236 (1993).

As to count six, Gray noted that "the prosecutor failed to call an expert witness concerning what was supposed to be ammunition. No one test fired the bullets or took them apart to determine if they actually were ammunition." Gray quoted a dictionary definition: " 'Cartridge' means a single, fixed round of firearm ammunition consisting of a cylindrical metal case containing an explosive powder and a projectile." (Format modified.) (Quoting "Webster's New World Dictionary.") Thereupon, Gray argued that "no evidence was adduced that the items found contained explosive powder or a projectile. Based on the evidence produced, the items found may have been a paperweight in the shape of bullets."

On February 20, 2004, the circuit court held a hearing on the motion. At the outset, the prosecution conceded count five—the ziploc packet containing the .001 grams—as well as count four, as *de minimis* infractions. However, the State contested and the circuit court denied the motion as to count six:

The court believes that Detective Gannon's testimony about the ammunition recovered from the defendant's vehicle was credible and that it was of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

Here the jury heard the testimony of Officer Gannon and examined for themselves the two rounds of .40 caliber ammunition that is the basis for this offense. Accordingly, a judgment of acquittal entered in counts four and five, but not in count six.

On March 19, 2004, the circuit court filed its judgment, convicting Gray in counts one, two and six. The circuit court sentenced Gray to an indeterminate term of imprisonment of five years in each of counts one and two, subject to a mandatory minimum term of eighteen months in count one, both terms to run concurrently with an indeterminate term of imprisonment of ten years in count six. Gray filed his notice of this appeal on April 16, 2004.

## II. Discussion.

### A.

For his first point of error on appeal, Gray contends the circuit court erred in denying, as to count six, his post-verdict motion for judgment of acquittal.[5] HRS § 134–7(b) provides, in pertinent part: "No person who . . . has been convicted in this State or elsewhere of having committed a felony, . . . shall own, possess, or control any firearm or ammunition therefor."

On this point, we present Gray's initial argument, verbatim:

The term "ammunition" is not defined in any Hawaii statute. Webster's Encyclopedia Unabridged Dictionary (1994 ed.) defines the word "ammunition" as "all the material used in discharging all types of firearms or any weapon that throw projectiles; power, shot, shrapnel, bullets, cartridges, and the means of igniting and exploding them, as primers and fuzes." Webster's defines the word "bullet" as a small metal projectile, part of a cartridge, for firing from small arms; a cartridge. Webster's further defines a "cartridge" as "a cylindrical case of pasteboard, metal, or the like, for holding a complete charge of powder, and often also the bullet or the shot for a rifle, machine gun, or other small arm."

The prosecution was required to prove that the items recovered in this case purporting to be .40 caliber "bullets" held a "complete charge of powder," or was capable of being fired, or was live ammunition.

Opening Brief at 12.

Continuing, Gray cites *Irebaria, supra,* a prosecution under HRS § 134–7(b), in which Irebaria was arrested while a passenger in a car with guns and bullets of cognate calibers in its trunk. *Irebaria,* 55 Haw. at 354–55, 519 P.2d at 1247–48. The supreme court framed the issue on appeal as "whether or not these items were in fact 'any firearm or ammunition therefor.' " *Id.* at 357, 519 P.2d at 1249.

The supreme court quoted the statutory definitions of "firearm" and "pistol" then in force:

The term "firearm" is defined by HRS § 134–1:

"Firearm" means any weapon, the operating force of which is an explosive. This definition includes pistols, revolvers, rifles, . . . . [6]

5. In *State v. Jhun,* 83 Hawai'i 472, 481, 927 P.2d 1355, 1364 (1996), the supreme court set forth the standard of review of a post-verdict motion for judgment of acquittal:

When reviewing a motion for judgment of acquittal, we employ the same standard that a trial court applies to such a motion, namely, whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, the evidence is sufficient to support a prima facie case so that a reasonable mind might fairly conclude guilt beyond a reasonable doubt. *State v. Pone,* 78 Hawai'i 262, 265, 892 P.2d 455, 458 (1995); *State v. Alston,* 75 Haw. 517, 528, 865 P.2d 157, 164 (1994); *State v. Rocker,* 52 Haw. 336, 346, 475 P.2d 684, 690

(1970). Sufficient evidence to support a prima facie case requires "substantial evidence" as to every material element of the offense charged. *State v. Eastman,* 81 Hawai'i 131, 135, 913 P.2d 57, 61 (1996). "Substantial evidence" as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. *Id.* Under such a review, we give "full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *State v. Yabusaki,* 58 Haw. 404, 411, 570 P.2d 844, 848 (1977).

6. HRS § 134–1 (Supp.2004) defines "firearm" as "any weapon, for which the operating force is an explosive, including but not limited to pistols,

The term "pistol" is further described in the same section:

"Pistol" or "revolver" means any firearms of any shape whatsoever with barrel less than twelve inches in length and capable of discharging loaded ammunition or any noxious gas.[7]

*Irebaria*, 55 Haw. at 357–58, 519 P.2d at 1249 (footnotes supplied). Thereupon, the supreme court held: "The State must prove as essential elements of its case that the weapons involved in this case were 'capable of discharging loaded ammunition' or that the ammunition seized was actually loaded." *Id.* at 358, 519 P.2d at 1249. Observing that a pistol of the same caliber as one of the guns found in the trunk of the car had actually been fired during a robbery Irebaria committed less than an hour before he was arrested, the supreme court ultimately concluded that "the State did prove by substantial, albeit circumstantial evidence that defendant possessed a firearm as defined by HRS § 134–1." *Irebaria*, 55 Haw. at 358, 519 P.2d at 1249–50.

In addition to the foregoing authorities, Gray argues statutory construction. Noting that both HRS § 134–7(b) and HRS § 134–1 (Supp.2004) contain the word "firearm," and thus construing them *in pari materia, see State v. Cornelio*, 84 Hawai'i 476, 487, 935 P.2d 1021, 1032 (1997) (" 'Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another.' HRS § 1–16 (1985)." (Brackets, citation and block quote format omitted.)), Gray comes to the conclusion that the "ammunition therefor" also contained in HRS § 134–7(b) must be capable of firing.

We conclude that *Irebaria* is controlling, and confirm that in a prosecution of a felon under HRS § 134–7(b) for possession of firearm ammunition, the State must prove, whether by direct or circumstantial evidence, that the ammunition was "actually loaded." *Irebaria*, 55 Haw. at 358, 519 P.2d at 1249.

Gray argues that Officer Gannon's testimony, which was essentially the opinion of one personally knowledgeable about the specific caliber of ammunition involved and the firearms it could actuate, was not evidence substantial enough to show that the ammunition found in the truck was HRS § 134–7(b) ammunition. Gray cannot be pinned down on appeal about the exact specifications of evidence he would deem substantial enough. Drawing upon his several supporting authorities, Gray is content to describe it as proof that the bullets "held a 'complete charge of powder' or were 'live' or 'loaded' ammunition, or that they were capable of firing." Opening Brief at 15. Alternatively, Gray avers that "the prosecution was required to present evidence, either in the form of expert opinion evidence or lay opinion evidence, that the ammunition was capable of firing." Opening Brief at 17.

Gray was less circumspect below, where he complained that "the prosecutor failed to call an expert witness concerning what was supposed to be ammunition. No one test fired the bullets or took them apart to determine if they actually were ammunition." For all Gray purportedly knew, "the items found may have been a paperweight in the shape of bullets."

We disagree with Gray on this point. We conclude that Officer Gannon's testimony was substantial evidence that the ammunition found in the truck was HRS § 134–7(b) ammunition, and was therefore sufficient evidence to withstand Gray's post-verdict motion for judgment of acquittal. *See State v. Jhun*, 83 Hawai'i 472, 481, 927 P.2d 1355, 1364 (1996).

We are encouraged in this conclusion by the supreme court's elaboration of *Irebaria* in *Padilla, supra.* There, Padilla posited a failure of proof of first degree robbery, "in that there was no proof that the gun carried by the robber was loaded or capable of being

revolvers, rifles, shotguns, automatic firearms, noxious gas projectors, mortars, bombs, and cannon."

7. HRS § 134–1 defines "pistol" or "revolver" as "any firearm of any shape with a barrel less than sixteen inches in length and capable of discharging loaded ammunition or any noxious gas."

fired." *Id.* at 156, 552 P.2d at 361.[8] The supreme court responded:

There was uncontroverted testimony that the robber entered the cafe, waved and pointed a gun and compelled acquiescence in the robbery by threats to kill. In the absence of evidence that the gun was not loaded or was not capable of being fired, an inference exists that it was loaded and capable of inflicting the harm which the robber threatened by his actions. There was no failure of proof that the gun carried in the robbery was a dangerous instrument within the meaning of HRS § 708–840 of the Penal Code.

*Padilla,* 57 Haw. at 157, 552 P.2d at 362 (footnote omitted). Although this holding was applicable only to the "dangerous instrument" element of the first degree robbery offense as then defined, neither of which is germane here, the supreme court saw fit to append a footnote to its holding, as follows:

It is not necessary for the purposes of this case to consider whether the elements of the offense of robbery in the first degree would be made out if there were proof that a firearm used in the robbery was unloaded or otherwise incapable of being fired or that the robbery was effected with a toy or simulated gun, bomb or other device. Also, there is no occasion to consider the relationship between the proof required to establish robbery in the first degree and that which we stated in *State v. Irebaria,* 55 Haw. 353, 519 P.2d 1246 (1974), to be required to establish the offense defined in HRS § 134–7(b), the essential element of which was the owner-ship, possession or control of a firearm. The applicable definition of "firearm", we there declared, required the State to prove that the weapon was capable of discharging loaded ammunition. The inferences which may be drawn from the facts established in this case would be sufficient to discharge this burden of proof if it were applicable.

*Padilla,* 57 Haw. at 157 n. 6, 552 P.2d at 362 n. 6.

Hence, it is not necessary for the purposes of our case to consider whether the ammunition found in the truck was unloaded or otherwise incapable of being fired, or merely a paperweight in the shape of bullets. *Id.* Given Detective Gannon's authoritative identification of the bullets as ammunition, and "[i]n the absence of evidence that the [ammunition] was not loaded or was not capable of being fired, an inference exists that it was loaded and capable[,]" *id.* at 157, 552 P.2d at 362; in other words, that it was "actually loaded." *Irebaria,* 55 Haw. at 358, 519 P.2d at 1249. Such an inference, in the absence of any contrary evidence, is substantial. *Jhun,* 83 Hawai'i at 481, 927 P.2d at 1364. Gray's first point of error on appeal is without merit.

## B.

■ For his other point of error on appeal, Gray contends the circuit court erred in refusing to propound a juror's question to Detective Gannon about the identity of the registered owner of the truck. This point, too, is unavailing.

---

8. In *State v. Padilla,* 57 Haw. 150, 155–56, 552 P.2d 357, 361 (1976), robbery in the first degree was defined as follows:

Robbery in the first degree is defined by HRS § 708–840, in relevant part, as follows:

Sec. 708–840  *Robbery in the first degree.*

(1) A person commits the offense of robbery in the first degree if, in the course of committing theft:

. . . .

(b) He is armed with a dangerous instrument and:

. . . .

(ii) He threatens the imminent use of force against the person of anyone who is present with intent to compel acquiescence to the taking of or escaping with the property.

(2) As used in this section, "dangerous instrument" means any firearm, or other weapon, device, instrument, material, or substance, whether animate or inanimate, which in the manner it is used or threatened to be used is capable of producing death or serious bodily injury.

HRS § 708–840 (1993 & Supp.2004) now defines "dangerous instrument" as "any firearm, whether loaded or not, and whether operable or not, or other weapon, device, instrument, material, or substance, whether animate or inanimate, which in the manner it is used or threatened to be used is capable of producing death or serious bodily injury." HRS § 708–840(2) (1993).

We first observe that Gray did not object to the circuit court's refusal·to propound the question. *Craft v. Peebles,* 78 Hawai'i 287, 294, 893 P.2d 138, 145 (1995) ("It is well settled that objections not raised or properly preserved at trial will not be considered on appeal." (Citation omitted.)). Indeed, defense counsel's reaction seemed more approbative than a simple absence of objection: "That's fine. I defer." It was, perhaps, not coincidence that Gray used the resulting lack of evidence on the issue of ownership to his advantage in closing argument. Under such circumstances, we are not inclined to review the purported error. *Cf. Roxas v. Marcos,* 89 Hawai'i 91, 124, 969 P.2d 1209, 1242 (1998) (the doctrine of judicial estoppel "prevents parties from playing 'fast and loose' with the court or blowing 'hot and cold' during the course of litigation" (citations and some internal quotation marks omitted)).

▪ Nonetheless, Gray urges plain error[9] upon us. We decline. As noted, Gray exploited the resulting lack of evidence in his closing argument. And the circuit court's refusal to propound the question kept the door closed to evidence—which had not been suppressed or otherwise excluded from trial—that Gray told the police he owned the truck. Because the record as a whole affirmatively shows that the purported error did not affect Gray's substantial rights, we will not notice plain error. Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) (2003); *State v. Kelekolio,* 74 Haw. 479, 515, 849 P.2d 58, 74–75 (1993). The same holistic shows, in any event, that the circuit court did not abuse its discretion in refusing to propound the juror's question. *State v. Culkin,* 97 Hawai'i 206, 229, 35 P.3d 233, 256 (2001).

## III. Conclusion.

Accordingly, the March 19, 2004 judgment of the circuit court is affirmed.

---

**9.** Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) (2003) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Obversely, HRPP Rule 52(a) (2003) provides: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." "The general rule is that a reviewing court will not consider issues not raised before the trial court." *State v. Corpuz,* 3 Haw.App. 206, 211, 646 P.2d 976, 980 (1982). "This court's power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes." *State v. Kelekolio,* 74 Haw. 479, 515, 849 P.2d 58, 74–75 (1993) (citation omitted). "This court will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." *State v. Vanstory,* 91 Hawai'i 33, 42, 979 P.2d 1059, 1068 (1999) (brackets, citation and internal quotation marks omitted).